## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | |
| ) | |
| ) | Case No. _____ |
| ) | |
| Christus St. Frances Cabrini Hospital ) | |
| 3330 Masonic Drive ) | |
| Alexandria, LA 71301 ) | |
| ) | |
| Christus St. Patrick Hospital ) | |
| 524 Dr. Michael DeBakey Drive ) | |
| Lake Charles, LA 70601 ) | |
| ) | |
| Christus Health Shreveport – Bossier ) | |
| 1453 E. Bert Kouns Industrial Loop ) | |
| Shreveport, LA 71105 ) | |
| ) | |
| Christus Lake Area Hospital ) | |
| 4200 Nelson Road ) | |
| Lake Charles, LA 70605 ) | |
| ) | |
| Christus St. Vincent Regional Medical Center ) | |
| 455 St. Michael's Drive ) | |
| Santa Fe, NM 87505 ) | |
| ) | |
| Christus Good Shepherd Medical Center Marshall ) | |
| 811 S. Washington Avenue ) | |
| Marshall, TX 75670 ) | |
| ) | |
| Christus Southeast Texas – St. Elizabeth ) | |
| 2830 Calder Street ) | |
| Beaumont, TX 77702 ) | |
| ) | |
| Christus Spohn Hospital Corpus Christi ) | |
| 600 Elizabeth Street ) | |
| Corpus Christi, TX 78404 ) | |
| ) | |
| Christus Spohn Hospital Beeville ) | |
| 1500 E. Houston Street ) | |
| Beeville, TX 78102 ) | |
| ) | |
| ) | |

Christus Mother Frances Hospital )
800 E. Dawson Street )
Tyler, TX 75701 )
)
Christus Spohn Hospital Kleberg )
1311 General East Cavazos Blvd. )
Kingsville, TX 78363 )
)
Christus Texas Medical Center )
1301 Wonder World Drive )
San Marcos, TX 78666 )
)
Christus Mother Frances Hospital Sulphur Springs )
115 Airport Road )
Sulphur Springs, TX 75482 )
)
Christus Santa Rosa Medical Center )
2827 Babcock Road )
San Antonio, TX 78229 )
)
Christus Jasper Memorial Hospital )
1275 Marvin Hancock Drive )
Jasper, TX 75951 )
)
Christus St. Michael Health System )
2600 St. Michael Drive )
Texarkana, TX 75503 )
)
Christus Spohn Hospital Alice )
2500 E. Main Street )
Alice, TX 78332 )
)
Renown Regional Medical Center )
1155 Mill Street )
Reno, NV 89502 )
)
Renown South Meadows )
10101 Double R Blvd. )
Reno, NV 89521 )
)
Public Hospital District No. 1 of Snohomish )
County )
14701 179th Avenue SE )
Monroe, WA 98272 )
)
)

King County Public Hospital District No. 2            )
12040 NE 128th Street                                 )
Kirkland, WA 98034                                    )
                                                      )
Presbyterian Hospital                                 )
1100 Central Avenue SE                                )
Albuquerque, NM 87106                                 )
                                                      )
Plains Regional Medical Center                        )
2100 N. Martin Luther King, Jr. Blvd.                 )
Clovis, NM 88101                                      )
                                                      )
Presbyterian Santa Fe Medical Center                  )
4801 Beckner Road                                     )
Santa Fe, NM 87507                                    )
                                                      )
St. Helena Hospital                                   )
10 Woodland Road                                      )
St. Helena, CA 94574                                  )
                                                      )
White Memorial Medical Center                         )
1720 E Cesar E Chavez Avenue                          )
Los Angeles, CA 90033                                 )
                                                      )
Hanford Community Hospital                            )
115 Mall Drive                                        )
Hanford, CA 93230                                     )
                                                      )
Rideout Memorial Hospital                             )
726 4th Street                                        )
Marysville, CA 95901                                  )
                                                      )
Reedley Community Hospital                            )
372 W Cypress Avenue                                  )
Reedley, CA 93654                                     )
                                                      )
Simi Valley Hospital and Health Care Services         )
2975 Sycamore Drive                                   )
Simi Valley, CA 93065                                 )
                                                      )
Glendale Adventist Medical Center                     )
1509 Wilson Terrace                                   )
Glendale, CA 91206                                    )
                                                      )
                                                      )
                                                      )

Ukiah Adventist Hospital                        )
275 Hospital Drive                              )
Ukiah, CA 95482                                 )
                                                )
Sonora Community Hospital                       )
1000 Greenley Road                              )
Sonora, CA 95370                                )
                                                )
Lodi Memorial Hospital Association, Inc.        )
975 S. Fairmont Avenue                          )
Lodi, CA 95240                                  )
                                                )
San Joaquin Community Hospital                  )
2615 Chester Avenue                             )
Bakersfield, CA 93301                           )
                                                )
Adventist Health Delano                         )
1401 Garces Hwy                                 )
Delano, CA 93215                                )
                                                )
Adventist Health Tulare                         )
869 North Cherry Street                         )
Tulare, CA 93274                                )
                                                )
Castle Medical Center                           )
640 Ulukahiki Street                            )
Kailua, HI 96734                                )
                                                )
Mid-Columbia Medical Center                     )
1700 E 19th Street                              )
The Dalles, OR 97058                            )
                                                )
Portland Adventist Medical Center               )
10123 SE Market Street                          )
Portland, OR 97216                              )
                                                )
                        *Plaintiffs,*           )
                          v.                    )
XAVIER BECERRA, in his official                 )
capacity as Secretary of Health and             )
Human Services,                                 )
200 Independence Avenue, SW                     )
Washington, DC 20201                            )
                                                )
                        *Defendant.*            )
_____)

## COMPLAINT

Plaintiffs, by and through their undersigned attorney, bring this action against Defendant Xavier Becerra in his official capacity as Secretary of the United States Department of Health and Human Services, and state as follows:

## INTRODUCTION

1.     During the development of the Medicare program's inpatient prospective payment system ("IPPS"), the Defendant, Secretary of the U.S. Department of Health & Human Services ("Secretary") erroneously calculated the fundamental building block (*i.e.*, the "Standardized Amount") of the federal diagnosis related group payments that would be used to reimburse hospitals for their inpatient services to program beneficiaries.   Specifically, the Secretary impermissibly reduced the recognized "allowable operating costs per discharge" for hospitals by including patient *transfers* between hospitals as discharges in the Standardized Amount calculation directed by Congress.   This error remains embedded and uncorrected in the inpatient payments received by hospitals to this day.

2.     Previously, the D.C. Circuit Court evaluated the same hospital claims in light of the Secretary's regulation at 42 C.F.R. § 405.1885 and confirmed that there is no bar to the Provider Reimbursement Review Board's ("PRRB") consideration of the errant "predicate facts" associated with the Secretary's original Standardized Amount calculation affecting the current cost reporting periods under appeal.   *Saint Francis Med. Ctr. v. Azar*, 894 F.3d 290, 291 (D.C. Cir. 2018). Consistent with the law in this Circuit, Plaintiffs, along with many others, sought correction of their inpatient payment rates for open cost reporting periods and pursued their claims before the PRRB.   Plaintiffs hospitals have challenged the Standardized Amount in accordance with the

PRRB's rules for group appeals and include forty groups covering cost reporting periods or federal fiscal years from 2009 through 2023.

3.     Despite litigating the *Saint Francis* plaintiffs' claims through the Circuit Court, the Secretary now asserts, via his PRRB's September 30, 2024, dismissal decision ("PRRB Dismissal"), that the hospitals' claims are precluded from administrative review by virtue of 42 U.S.C. § 1395ww(d)(7)(A), which bars administrative and judicial review of certain budget neutrality adjustments to the Standardized Amount required by Congress in 1984 and 1985. According to the novel theory advanced by the PRRB Dismissal, the Standardized Amount became "inextricably intwined" with the 1984 and 1985 budget neutrality adjustments and, through this purported bond, the Standardized Amount was somehow legally absorbed into the preclusion of review established by 42 U.S.C. § 1395ww(d)(7)(A).  In other words, the PRRB suggests now that neither it nor this Circuit should have ever reviewed the *Saint Francis* claims in the first place.

4.     Alas, this Circuit's and the PRRB's prior efforts in *Saint Francis* were not in vain. The Plaintiffs' claims are not precluded by 42 U.S.C. § 1395ww(d)(7)(A), or any other statutory provision, because the Plaintiffs' appeals do ***not*** involve the "proportional adjustments" to the "applicable percentage increase" in effect for the federal fiscal years 1984 and 1985.  Instead, the Plaintiffs complain of the adequacy of the Standardized Amount, the basic building block to which those adjustments were temporarily applied in 1984 and 1985.  Nothing precludes a challenge to the adequacy of the Standardized Amount as the PRRB implicitly concluded in *Saint Francis* and had previously ruled in *Columbia/HCA 1984-1986 PPS Federal Rate/Malpractice Group v. Blue Cross & Blue Shield Ass'n*, PRRB Dec. 2000-D74 (Aug. 18, 2000).

5.     The PRRB's dismissal of the Plaintiff hospitals' claims represents an arbitrary departure from prior administrative and judicial decisions and the plain language of the statute

detailing the calculation of the Standardized Amount.  In accordance with the standards for judicial review of actions arising under Title XVII of the Social Security Act, 42 U.S.C. §§ 1395 *et seq.* (the "Medicare Act" or the "Act"), the Administrative Procedure Act, 5 U.S.C. §§ 551 *et. seq.* (the "APA"), and other authorities, the Plaintiffs seek relief in this Court and an order reversing the PRRB Dismissal and remanding such appeals for further consideration of the Secretary's error in the calculation of the Standardized Amount, or, in the alternative, a declaration that the Standardized Amount is necessarily lower than required by statute and an order that the Secretary recalculate the Plaintiffs' IPPS payments for the fiscal years under appeal to correct for his original calculation error.

## JURISDICTION AND VENUE

6.    This action arises under the Medicare Statute, Title XVIII of the Social Security Act, 42 U.S.C § 1395 *et seq.*, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*

7.    Jurisdiction is proper under 42 U.S.C. §§ 1395oo(a)(1)(A)(ii), 42 U.S.C. § 1395oo(f)(1), 28 U.S.C. § 1331, and 28 U.S.C. § 1361.

8.    Venue is proper in this judicial district in accordance with § 1395oo(f)(1) and 28 U.S.C. § 1391(e).

## PARTIES

9.    Plaintiffs in this action are 40 hospitals that participate in the Medicare program, are reimbursed under the IPPS, and were paid according to the standardized amounts that the Secretary published for FYs 2019 through 2024.[1]  Plaintiffs are set forth in Appendix A of this Complaint, which is incorporated herein by reference.

---

[1] The Plaintiffs are also parties to a similar action pending in this Court (*Northwestern Memorial Hospital, et al. v. Becerra*, No. 1:24-cv-01309) based on different fiscal periods affected by the Secretary's payment error that were dismissed at different times by the PRRB.

10.     The Defendant, Xavier Becerra, is the Secretary of HHS, which administers the Medicare and Medicaid programs established under Titles XVIII and XIX of the Social Security Act.  Defendant Becerra is sued in his official capacity only.  The Centers for Medicare & Medicaid Services ("CMS") is the federal agency to which the Secretary has delegated administrative authority over the Medicare and Medicaid programs.  References to the Secretary herein are meant to refer to him, his subordinate agencies and officials, and to his official predecessors or successors as the context requires.

## STATUTORY AND REGULATORY BACKGROUND

### Hospital Payments for Inpatient Services

11.     The Medicare program provides federally funded health insurance for certain elderly and disabled persons under Title XVIII of the Social Security Act. 42 U.S.C. § 1395 *et seq*.  This dispute concerns Medicare Part A, which covers inpatient hospital and certain other institutional services.

12.     Prior to October 1, 1983, Medicare compensated most hospitals providing inpatient services based on "reasonable costs."  The Social Security Amendments of 1983 instituted a new prospective payment system for inpatient hospital services, known as the IPPS, effective for cost reporting periods beginning on or after October 1, 1983.  Social Security Amendments of 1983, Pub. L. No. 98-21, § 601, 97 Stat. 65, 149-172 (1983) (codified at 42 U.S.C. § 1395ww(d)).

13.     Under the IPPS, payment is calculated for each inpatient encounter by multiplying a predetermined base payment –the Standardized Amount – which roughly represents the national average cost of a typical inpatient encounter, by a weighting factor (known as a diagnosis-related group or "DRG") reflecting the relative cost of treating patients with a certain diagnosis.

14.     In advance of each federal fiscal year, the Secretary announces in the Federal Register the Standardized Amount that will be used to calculate payment in the coming year. 42 U.S.C. § 1395ww(e)(4)-(5). The Secretary does not recalculate the Standardized Amount from scratch each year. "Instead, following Congress's directive, [the Secretary] calculated the standardized amount for a base year and has since carried that figure forward, updating it annually for inflation." *Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011).

### Statutory Steps for Calculating the 1984 Inaugural Standardized Amount and the Secretary's Error

15.     The IPPS was established with a beginning date of October 1, 1983 (*i.e.*, federal fiscal year 1984). *See* Pub. L. 98-21, 97 Stat. 156, Apr. 20, 1983; 48 Fed. Reg. 39752, 39759 (Sept. 1, 1983). The original computation of the standardized amount is set forth in subsection 42 U.S.C. § 1395ww(d)(2) and breaks the calculation into a series of steps.

16.     First, Congress explicitly instructs that the "Secretary *shall determine* the allowable operating costs *per discharge* of inpatient hospital services for the hospital for the most recent cost reporting period for which data are available." 42 U.S.C. § 1395ww(d)(2)(A) (emphasis added). This was the cost reporting period for the year 1981. *See* 48 Fed. Reg. 39725, 39763 (Sept. 1, 1983). It is in this very first step that the Secretary made a clear error by including patients who transferred from one hospital to another as "discharges," thereby necessarily reducing the amount of allowable hospital operating costs that would be recognized in this base rate.

17.     In implementing this first statutory directive of IPPS, the Secretary adopted definitions of "discharge" and "transfer" that distinguished between patients who were discharges having received "completed treatment" and discharges where patients are transferred to other institutions for related care. *See* 49 Fed. Reg. 243 (Jan. 3, 1984). However, the Secretary did not eliminate the "transfers" he distinguished by rule from the calculation of "net allowable operating

costs *per discharge*" when making the base rate calculation directed by Congress under the same IPPS statute for which the Secretary adopted the definitions.

18.    Despite this glaring difference, the Secretary did not provide a rational explanation for the inconsistent treatment of transfers under IPPS calculation methodology.  Instead, the Secretary acknowledged the lower costs associated with transfers and used that rationale to justify paying *less* for transfer cases than discharges under IPPS despite transfers being *included* in the same data used to calculate the Standardized Amount.  *See* FFY 1984 IPPS Interim Final Rule, 48 Fed. Reg. 39752, 39763 (Sept. 1, 1983) ("The transferring hospital, generally providing a limited amount of treatment to the transferred patient, is not entitled to payment at the full prospective rate.").  Notwithstanding imposing a payment differential upon hospitals for transfers, the Secretary arbitrarily suggested, in the context of implementing the Standardized Amount calculation, that the agency "would expect any discrepancy between the 'old' and 'new' definition of discharge to have no significant effect on the rates." 49 Fed. Reg. 234, 245-46 (Jan. 3, 1984).[2] The contradiction cannot bear even modest scrutiny and helped to arbitrarily cement the "false facts" used by the Secretary to establish the understated Standardized Amount.  *See Saint Francis*, 894 F.3d at 298 (Kavanaugh, J., concurring).

19.    After the "cost per discharge" amount was (erroneously) determined in subsection (d)(2)(A), Congress instructed that it was to be "updated" by certain inflation factors.[3]  42 U.S.C.

---

[2] Further undermining the Secretary's rationale is his own acknowledgment of the need to correct the initial base rate calculation for his prospective payment system for hospital *capital* costs (*i.e.*, the "Capital PPS").  *See* 56 Fed. Reg. 43449, 43387 (Aug. 30, 1991) ("We agree with the commenters that the treatment of transfers in the discharge count is problematic").  The Secretary then made an adjustment to the Capital PPS calculation to correct for the impact.  *Id.*  Despite the operating IPPS being a substantially larger proportion of a hospital's inpatient reimbursement than the Capital PPS, the Secretary has yet to make an adjustment to fix his original discharge calculation error.

[3] Specifically for 1984, the statute directs the Secretary to multiply the (d)(2)(A) base rate cost per discharge by an amount reflecting the rate of change in hospital costs between the cost period used in subsection (d)(2)(A) (*i.e.*, the 1981 cost reporting period) and fiscal year 1983 and then project that amount for 1984 by the "applicable percentage

§ 1395ww(d)(2)(B). Once the base costs per discharge amounts were updated for inflation as directed by subparagraph (2)(B), the amounts were "standardized" for each hospital by excluding an estimate of indirect medical education costs, adjusting for variations by area wage index, and adjusting for variations in case mix. 42 U.S.C. § 1395ww(d)(2)(C)(i)-(iii).[4]

20.    Finally, the standardized base cost per discharge amounts for each hospital determined under subsection (d)(2)(C) were then used to compute an average of the standardized amounts for the United States and each region (*i.e.*, each of the nine census divisions established by the U.S. Bureau of Census) for urban and rural hospitals. 42 U.S.C. § 1395ww(d)(2)(D). The amounts calculated in subparagraphs (2)(A)-(D) constitute the "average standardized amount" that was then used to compute the DRG payment amounts for inpatient services for fiscal year 1984.

21.    Once established by the Congressionally-directed calculation steps in subsection 1395ww(d)(2)(A)-(D), the Standardized Amount for fiscal year 1984 (with the discharge calculation error baked in) was *then* reduced for the value of outliers (d)(2)(E) and adjusted for budget neutrality (d)(2)(F).[5] The IPPS statute plainly describes the 1984 budget neutrality adjustment as being *applied to* and *not* incorporated within the Standardized Amount determined in subsection (d)(2)(A)-(D). That is, subsection (d)(2)(G)(i)(I) makes clear that the "average standardized amount computed under subparagraph (D)," with the discharge calculation error embedded, was merely "adjusted" for budget neutrality by subparagraph (F) *for that fiscal year*. 42 U.S.C. 1395ww(d)(2)(G)(i)(I).

---

increase" in subsection (b)(3)(B). 42 U.S.C. § 1395ww(d)(2)(B)(i)-(ii). There is no applicable percentage increase for 1984 or 1985 set forth in subsection (b)(3)(B). *See* 42 U.S.C. § 1395ww(b)(3)(B).

[4] A separate adjustment to standardize the base cost per discharge calculation of subsection (d)(2)(A) was added by Congress for discharges occurring on or after October 1, 1986, to account for an estimate of certain disproportionate share hospital payments. 42 U.S.C. § 1395ww(d)(2)(C)(iv). This would not have applied for fiscal year 1984.

[5] Subparagraph (F) contains the requirement to make the adjustment set forth at subsection (e)(1)(B) "*for that fiscal year*" *(i.e., 1984)*. 42 U.S.C. § 1395ww(d)(2)(F) (emphasis added). *See* Social Security Amendments of 1983, Pub. L. 98-21, 97 Stat. 156, Apr. 20, 1983, § 601.

**Statutory Steps for Calculating the 1985 Standardized Amount**

22.    After fiscal year 1984, the Medicare IPPS statute directs a computation for the Standardized Amount under subsection (d)(3).  *See* 42 U.S.C. § 1395ww(d)(3).  With respect to the average Standardized Amount for periods before October 1, 1987 (*i.e.*, the two fiscal years from October 1, 1985 through September 30, 1987), Congress instructed that, "the Secretary shall compute an average standardized amount…equal to the respective average standardized amount computed for the previous fiscal year *under paragraph (2)(D)*, or under this subparagraph [*i.e.,* (3)(A)(i)], increased by the applicable percentage increase under subsection (b)(3)(B)." 42 U.S.C. § 1395ww(d)(3)(A)(i) (emphasis added).

23.    Paragraph (2)(D) represents the previously described 1984 computation of "the average of the standardized amounts determined under subparagraph [(2)](C)…"  *See* 42 U.S.C. § 1395ww(d)(2)(D).  In turn, "Subparagraph [(2)](C)" represents the "standardization" of the "amount updated under subparagraph [(2)](B) for each hospital" by making the certain exclusions and adjustments described above.  42 U.S.C. § 1395ww(d)(2)(C).  And the "amount updated under subparagraph [(2)](B)" is simply the "amount determined under subparagraph [(2)](A) for fiscal year 1984" (*i.e.*, the base allowable operating costs per discharge amount containing the original discharge calculation error).  It is through this statutory recycling that the Secretary's original discharge calculation error continued in 1985 and, as described below, in all the years to follow.

24.    Critically as it relates to the PRRB's justification for dismissal, the 1984 budget neutrality adjustment was *not* part of the standardized amount calculated under the directives of paragraph (2)(D) and its related paragraphs (2)(A)-(C).  *See* 42 U.S.C. 1395ww(d)(2)(G)(i)(I). Moreover, the 1985 budget neutrality adjustment was also applied to the fiscal year 1985 average

standardized amounts "as may be required under subsection (e)(1)(B) *for that fiscal year*." 42 U.S.C. § 1395ww(d)(3)(C)(i) (emphasis added).

25.     As with 1984, Congress expressly illustrated this separation in the computation of DRG specific rates for 1985 as established by subsection (d)(3)(D), which dictates a rate equal to the product of "(I) the *average standardized amount (computed under subparagraph [(3)](A))*, reduced under subparagraph [(3)](B), and *adjusted or reduced under subparagraph [(3)](C) for the fiscal year*…and (II) the weighting factor (determined under paragraph (4)(B)) for that diagnosis related group…" 42 U.S.C. § 1395ww(d)(3)(D)(i) (emphasis added).  Again, the 1985 Budget Neutrality Adjustment was *applied to* the separately calculated average standardized amount *for that fiscal year* and not incorporated, or "intertwined," within the standardized amount calculation.[6]

### Statutory Steps and Special Directives for Calculating the Standardized Amount for 1986

26.     The lack of any "intertwining" of the 1984-1985 budget neutrality adjustments and the Standardized Amount can be even more readily observed by following the Congressional directives for calculating the DRG payment amounts for fiscal year 1986, despite federal budgetary complications at the time.

27.     For the fiscal year October 1, 1985 through September 30, 1986, the Secretary was directed to again "compute an average standardized amount…equal to the amount computed for the previous fiscal year under *paragraph (2)(D)* or under this subparagraph, increased for the fiscal year involved by the applicable percentage increase under subsection (b)(3)(B)."  42 U.S.C.

---

[6] This is also clear in the amendments to subsection (d)(3) adopted in the Consolidated Omnibus Reconciliation Act of 1985 in which Congress explicitly added the language "for fiscal year 1985" after the term "neutrality" and "For *discharges occurring in fiscal year 1985*, the Secretary" to the beginning of the subparagraph at (d)(3)(C)(i), clarifying the limit of its applicability.  *See* Pub. L. 99-272, § 9104(b)(2)(A)-(C) (1986) (emphasis added).

§ 1395ww(d)(3)(A)(i) (emphasis added).[7]  By its express reference to the standardized amount calculation in paragraph (2)(D) (used in the previous year calculation), the 1986 Standardized Amount _excludes_ the 1984-1985 budget neutrality adjustments from the computation because such adjustments were applied through the operation of paragraphs (2)(F) and (3)(C), respectively. _See_ 42 U.S.C. § 1395ww(d)(2)(F), (3)(C).

28.    However, there were certain extenuating complications impacting the determination of the DRG payment rates for fiscal year 1986 that disrupted the "statutory flow" of the calculation of the Standardized Amount.  Specifically, the Secretary made a recommendation to Congress that it freeze the 1986 DRG payment rates at the FFY 1985 amounts because the Secretary believed the 1985 rates, which included the 1985 budget neutrality adjustment, to be "overstated."  _See_ 50 Fed. Reg. 35646, 35704 (Sept. 3, 1985) (regarding the unaudited data). Congress initially acted upon the Secretary's September 3, 1985 recommendation when, on September 30, 1985, it enacted § 5(a) of the Emergency Extension Act of 1985 to maintain existing IPPS payment rates at the FFY 1985 Rates…" and extended the freeze on multiple occasions during 1986.  _See_ Complaint Exhibit 1 – PRRB Dismissal, Appendix A at 38-39 (citations omitted).

29.    In this limited respect, and for this limited period, Congress did recognize the incorporation of the 1985 budget neutrality adjustment in the amount of payment for hospitals, "_[n]otwithstanding any other provision of law_…under section 1886 of the Social Security Act [§ 1395ww] for inpatient hospital services for discharges occurring…during the extension period…" Emergency Extension Act of 1985, Pub. L. 99-107, § 5(a) 99 Stat. 479 (1985) (emphasis

---

[7] For fiscal year 1986, the calculation for the "previous fiscal year" of 1985 would have been expressly made under paragraph (2)(D) by direction of paragraph (3)(A).  _Id._

added).  However, the "extension period" for the payment freeze enacted by the Emergency Extension Act of 1985 ended on May 1, 1986.

30.    More importantly, the governing provisions of § 1395ww(d)(3)(A) resumed for standardized amount calculations for the remainder of fiscal year 1986, *without the 1985 Budget Neutrality Adjustment incorporated*, and with an *increase* to the expected applicable percentage increase from ¼ percent to ½ percent.  *See* Medicare and Medicaid Budget Reconciliation Amendments of 1985, Pub. L. 99-272, §§ 9101(b); 9104(b)(2)(A)-(C), 100 Stat. 158, (1986).  Congress had originally reduced the 1 percentage point annual percentage increase planned for fiscal year 1986 to ¼ of a percent by virtue of the Deficit Reduction Act of 1984 *before* the Secretary issued his September 3, 1985 report and recommendation suggesting that the standardized amounts were "overstated."  *See* Deficit Reduction Act, Pub. L. 98-369, § 2310(a), 98 Stat. 494, 1075 (1984).  In April of 1986, six months after the analysis presented in the Secretary's recommendation, Congress *doubled* the applicable percentage increase to ½ a percentage point, effectively repudiating the Secretary's suggestion.

**Statutory Steps for Calculating the Standardized Amount for 1987 and Beyond**

31.    Finally, the continued permanence of the Secretary's original discharge calculation error and its marked separation from the 1984 and 1985 budget neutrality adjustments can be further illustrated by Congress's payment instructions for 1987.  For discharges in fiscal years occurring on or after October 1, 1987, the Secretary was directed to "compute an average standardized amount…equal to the respective average standardized amount computed for the previous fiscal year under this subparagraph increased by the applicable percentage increase under subsection (b)(3)(B)(i) with respect to hospitals located in the respective areas for the fiscal year involved."  42 U.S.C. § 1395ww(d)(3)(A)(ii).  As described above, the fiscal year 1986 statutory

computation of the average standardized amount *did not* include any incorporation of the 1984-1985 budget neutrality adjustments.

32.    This is explicitly emphasized in the history of enactments affecting the Standardized Amount calculation in 1986 and 1987.  As described above, the fiscal year 1986 DRG payment amounts contained a mix of Standardized Amount calculations due to the impact of the Emergency Extension Act of 1985, *i.e.*, based on the Secretary's recommendation for a freeze at "FFY 1985 standardized amounts that had already been adjusted for budget neutrality," which the Secretary believed to be overstated.  However, Congress ultimately rejected the Secretary's recommendation (and the analysis upon which it was based) when it ended the payment rate freeze on May 1, 1986, with a larger than originally announced "applicable percentage increase."

33.    At the time, Congress could not have been clearer in rejecting the Secretary's attempt to embed the 1985 budget neutrality adjustment into the 1986 standardized rates as it required that, "for discharges occurring on or after October 1, 1986, the applicable percentage increase (described in section 1886(b)(3)(B)) *for discharges occurring during fiscal year 1986 shall be deemed to have been ½ percent*."  Medicare and Medicaid Budget Reconciliation Amendments of 1985, Pub. L. 99-272, § 9101(e)(B), 100 Stat. 154 (1986).  In other words, for the 1987 Standardized Amount calculations relying on "the prior year's" standardized amount under the statutory instruction of § 1395ww(d)(3)(A), the effect of the temporary freeze of standardized rates incorporating the 1985 budget neutrality adjustment was eliminated as if it did not occur. *See Id.*

34.    There is no "inextricable tie" between the 1984-1985 budget neutrality adjustments and the Standardized Amount.  It is clear from Congress's instructions for the calculation of the

Standardized Amount that the 1984 and 1985 budget neutrality adjustments were just as their name implies, temporary adjustments to the calculation directed by Congress under 42 U.S.C § 1395ww(d)(2)(A). Congress has directly spoken on the matter and made it abundantly clear.

35.    Thus, from October 1, 1986, through the present date, the Standardized Amount has contained the discharge calculation error made by the Secretary when failing to follow the directive of subsection (d)(2)(A). While not presented in as much detail as in this Complaint, this is the statutory basis upon which the D.C. Circuit accurately observed that, "[t]o this day, therefore, Medicare payments for inpatient services depend in part on factual determinations derived from 1981 and embedded in 1983 calculations, including the calculation of 'allowable operating costs per discharge'" *Saint Francis,* 894 F.3d at 291; *see also Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 205 (D.C. Cir. 2011) (stating "Central to the issue before us, CMS does not calculate the standardized amount from scratch each year. Instead, following Congress's directive, it calculated the standardized amount for a base year and has since carried that figure forward, updating it annually for inflation.").

## The Medicare Appeals Process

36.    Section 1878(a) of the Social Security Act entitles a provider of services under the Medicare program to a hearing before the PRRB if three prerequisites are met: (i) the provider is dissatisfied with a final determination of the Secretary as to the amount of the payment under the Medicare Act; (ii) the provider files a request for hearing within 180 days of the final determination (typically a Notice of Program Reimbursement); and (iii) the amount in controversy is at least $10,000 for an individual appeal or $50,000 for a group appeal. 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835. If an appeal satisfies these requirements, the PRRB generally has jurisdiction to hear the appeal.

37.     IPPS standardized rate calculations, when published, constitute "final determinations" that may be appealed to the PRRB.  42 U.S.C. § 1395oo(a)(1)(A)(ii); 42 C.F.R. § 405.1835.

38.     Board decisions regarding substantive or jurisdictional matters, along with any subsequent reversals, affirmances, or modifications by the Secretary regarding those matters, are "final decisions" that providers have a right to challenge by filing a civil action within sixty days following the decision, reversal, affirmance, or modification.  42 U.S.C. § 1395oo(f)(1).

**STATEMENT OF THE CASE SPECIFIC TO PLAINTIFF HOSPITALS**

39.     In accordance with 42 U.S.C. § 1395oo(a) and this Circuit's decision in *Saint Francis*, the Plaintiff hospitals filed administrative appeals with the PRRB challenging the Secretary's failure to adjust the Standardized Amount that he announced for multiple fiscal years from 2019 through 2024 to correct for the errors he made in calculating the inaugural Standardized Amount.  These appeals are represented in the PRRB Dismissal, Appendix A, by their respective group names and administrative case numbers (collectively, the "Hospital PRRB Appeals") and are incorporated herein by reference.  *See* Complaint Exhibit 1 – PRRB Dismissal at Appendix A.

40.     The Hospital PRRB Appeals were timely filed based on either (i) a hospital's receipt of its final cost report reimbursement determination from its Medicare Administrative Contractor (*i.e.*, a Notice of Program Reimbursement) or (ii) direct challenges to the IPPS Final Rule for a particular federal fiscal year after it was published in the Federal Register.  The Hospital PRRB Appeals all exceeded the $50,000 minimum threshold for PRRB group appeals.

41.     The PRRB dismissed the Hospital PRRB Appeals by a decision dated September 30, 2024, holding that the Medicare statute precluded any challenge of the Secretary's calculation of the FY 1984 standardized amount.  PRRB Dismissal at 1.  Plaintiffs are parties to a similar

action in this Court with other hospital plaintiffs making the same claims for separate fiscal years that were dismissed by the PRRB on March 4, 2024.  *See Northwestern Memorial Hospital, et al. v. Becerra,* No. 1:24-cv-01309.

42.     In its dismissal decision, the PRRB claimed that the Secretary was required by statute to adjust the standardized amounts in FYs 1984 and 1985 so that aggregate IPPS payments in those years would be no more or less than what they would have been under the reimbursement system that preceded the IPPS.  *See* 42 U.S.C. § 1395ww(e)(1)(B); PRRB Dismissal at 14-16.  The PRRB decided that these "budget neutrality" adjustments were "*inextricably intertwined*" with the calculation of the standardized amount such that challenging the Secretary's calculation of the inaugural standardized amount was tantamount to challenging the budget neutrality adjustments that were applied to that amount.  PRRB Dismissal at 1-2.  And, since the budget neutrality adjustments are shielded from review by statute, 42 U.S.C. § 1395ww(d)(7)(A), the Board decided that the statute prohibited the Plaintiffs' challenge of the FY 1984 standardized amount.

43.     Plaintiffs now file this Action within 60 days of the PRRB Dismissal as the decision constitutes final administrative action, and, thus, pursuant to 42 U.S.C. § 1395oo(f) and 42 CFR § 405.1877, is subject to judicial review by this Court.

44.     Under 42 U.S.C. § 1395oo(f)(1), review of a final decision of the Secretary "shall be tried pursuant to the applicable provisions under chapter 7 of title 5" of the U.S. Code, which contains the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et seq*.

45.     Under the APA, a "reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be . . . (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or

limitations, or short of statutory right; (D) without observance of procedure required by law; [or] (E) unsupported by substantial evidence." 5 U.S.C. § 706(2).

46.    For the reasons described in the preceding paragraphs, the PRRB Dismissal is unlawful and should be set aside for at least the reasons set forth below.

## COUNT I

### Judicial Review Under Medicare Act and the APA: The Secretary's Actions Are Contrary to the Medicare Act and the APA and Are *Ultra Vires*

47.    The allegations set forth in the preceding paragraphs are incorporated by reference as if fully set forth herein.

48.    Agencies may not act "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

49.    The Secretary's decision to adopt the Standardized Amount for the multiple federal fiscal years covering the Hospital PRRB Appeals without correcting for the error he made when he calculated the original 1984 standardized amount is contrary to the Medicare statute and *ultra vires*. Congress expressly required the Secretary to calculate the inaugural standardized amount by determining each hospital's "costs per *discharge*." 42 U.S.C. § 1395ww(d)(2)(A) (emphasis added). The Secretary ignored Congress's express command—and thus acted *ultra vires*—by including transfer cases in the denominator of that calculation.

50.    Indeed, the Secretary's inclusion of transfer cases in the costs per discharge calculation undermines the primary purpose of the IPPS statute. Congress intended IPPS payments to be determined by multiplying a figure representing the average costs per discharge (*i.e.*, the Standardized Amount) by factors reflecting the relative costliness of a given patient.

But because the Secretary miscalculated the basic building block of IPPS, the average cost per inpatient encounter, the IPPS payment formula was, and remains, inherently skewed.

51.    Moreover, the PRRB Dismissal purports to be based on the preclusion of review established by Congress in § 1395ww(d)(7)(A) of the Act.  However, this preclusion bars administrative and judicial review of only a narrow category of challenges to the Secretary's determination of the requirement, or the proportional amount, of any budget neutrality adjustment effected pursuant to 42 U.S.C. § 1395ww(e)(1) in 1984 and 1985.  The Hospital PRRB Appeals do not challenge these budget neutrality adjustments but instead seek correction of the base Standardized Amount to which those adjustments were temporarily applied, and which remains founded on an uncorrected calculation error.

52.    To deny administrative or judicial review, there must be a showing of "clear and convincing evidence" that Congress intended to exclude a matter from administrative and judicial review.  *See Abbott Laboratories. v. Gardner*, 387 U.S. 136, 87 S. Ct. 1507, 1511 (1967).  There is a strong presumption that Congress does not mean to prohibit all judicial review of agency action even when it may direct preclusion in some circumstances.  *See Bowen v. Mich. Acad. of Family Physicians*, 476 U.S. 667 (1986).  As the statutory analysis above illustrates, there is no evidence at all from Congress supporting the purported basis for the PRRB Dismissal.

## COUNT II

### The Secretary's Decision is Contrary to Law

53.    The allegations set forth in the preceding paragraphs are incorporated by reference as if fully set forth herein.

54.    The PRRB Dismissal of the Hospital PRRB Appeals is also contrary to law in violation of section 706(2)(A) of the APA.  For all of the reasons set forth in the preceding

paragraphs, neither the PRRB Dismissal nor the Secretary's original Standardized Amount calculation comply with the express terms of the governing statutes.

55.      The plain meaning of 42 U.S.C. § 1395ww(d)(2)(A) provides the Court with all the direction it needs to confirm the Secretary's actions in this case.  Likewise, the express terms of 1395ww(d)(7)(A) undermine any basis for the PRRB Dismissal.

## COUNT III

### The Secretary Failed to Observe Procedure Required by Law

56.      The allegations set forth in the preceding paragraphs are incorporated by reference as if fully set forth herein.

57.      The Secretary's decision not to adjust the standardized amounts for the Hospital PRRB Appeals was unlawful because he "has failed to articulate a satisfactory explanation for [his] [in]action."  *Athens Cmty. Hosp., Inc. v. Shalala*, 21 F.3d 1176, 1179 (D.C. Cir. 1994) (internal quotation omitted).  As noted previously, when adopting the original Standardized Amount calculation, the Secretary claimed that he "would expect any discrepancy between the 'old' and 'new' definition of discharge to have no significant effect on the rates" despite imposing a payment differential upon hospitals for transfers in the same rule.  *See* 48 Fed. Reg. at 39763; 49 Fed. Reg. at 245-46.  The Secretary further exposed this flaw when he acknowledged at the time he calculated the prospective payment system for capital costs that including transfer cases in the denominator of the costs per discharge calculation was "problematic" and would dilute that calculation.  *See* 56 Fed. Reg. 43449, 43387 (Aug. 30, 1991).  Yet that is exactly what the Secretary did when he calculated the IPPS standardized amount for FY 1984, and he has yet to correct for that error despite repeated opportunities to do so.

**COUNT IV**

**The Secretary's Actions Are Arbitrary and Capricious and Lack the Support of Substantial Evidence**

58.    The allegations set forth in the preceding paragraphs are incorporated by reference as if fully set forth herein.

59.    The APA deems an agency action unlawful when that agency acts in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A).

60.    The Secretary's failure to adjust the standardized amounts for the Hospital PRRB Appeals to correct for the inclusion of transfer cases in the inaugural standardized amount is arbitrary, capricious, and an abuse of his discretion.

61.    The Secretary acted arbitrarily because he offered an explanation for his decision to treat discharges and transfers the same for rate setting purposes that ran counter to the evidence before him.  He failed to rationally explain why he decided to treat discharges and transfers differently for payment purposes but not for rate setting purposes.  The explanation that he proffered—that bundling transfers and discharges would have little effect on rate setting—is belied by his own rationale to adopt a differential payment treatment for transfers.  It is further exposed by his decision to apply a "correction factor" to the inaugural Capital PPS standardized amount to eliminate the effect of the inclusion of transfers in the denominator, particularly in light of substantially smaller reimbursement impact of Capital PPS in comparison to the operating IPPS. The Secretary also failed to consider relevant data and alternate methodologies in establishing the IPPS standardized amount.

62.     The Board's decision dismissing the Plaintiffs' appeals was also arbitrary and capricious because the Board disregarded the plain reading of the Act and reversed its twenty-year old precedent without a rational basis.

63.     Moreover, the PRRB Dismissal suggests, without explanation, that neither the PRRB nor the Courts had the authority to hear the original challenges to the Standardized Amount that were raised in *Saint Francis.*  In other words, over a decade of prior litigation regarding the Standardized Amount was invalid and unnecessary.  The absurdity of the proposition condemns itself as much as the plain letter of the law exposes its fatal flaw.

**COUNT V**

**Mandamus**

64.     The allegations set forth in the preceding paragraphs are incorporated by reference as if fully set forth herein.

65.     Federal district courts have "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.

66.     The Secretary has the non-discretionary duty to apply properly the substantive and procedural laws relating to Medicare payment, including to fully compensate the Plaintiffs the amounts they are entitled to under the law.  The Secretary violated this non-discretionary duty by failing to correct the standardized amount calculation that governed hospital compensation for the Hospital PRRB Appeals.

67.     Thus, Plaintiffs request an order from this Court that the Secretary recalculate the IPPS payments for the Hospital PRRB Appeals after correcting for the Secretary's failure to exclude transfers in the original IPPS standardized amount calculation.

## COUNT VI

## **All Writs Act**

68.     The allegations set forth in the preceding paragraphs are incorporated by reference as if fully set forth herein.

69.     The Secretary violated the Medicare Act and APA by failing to correct underlying factual errors in the FY 1984 standardized amount calculation, by unlawfully dismissing Plaintiffs' appeals before the PRRB, and by reimbursing the Plaintiffs an amount lower than the statutorily required amount from services provided for years during the Hospital PRRB Appeals.

70.     Under the All-Writs Act, federal district courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a).

71.     By law, Plaintiffs are entitled to an order requiring the Secretary to make proper IPPS payments to Plaintiffs and to pay appropriate interest on the underpayments. *See* 28 U.S.C. § 1651, 42 U.S.C. §§ 1395oo(f)(2), 1395g(d) and/or 1395l(j), and 42 C.F.R. § 405.378.

## REQUEST FOR RELIEF

72.     Plaintiffs request the following orders:

(a)     Vacating the Secretary's ruling that the PRRB lacks jurisdiction to review appeals regarding the FY 1984 Standardized Amount;

(b)     Ordering the Secretary to recalculate the Standardized Amount without treating transfers as if they were discharges and applying that revised standardized amount in calculating Plaintiffs' IPPS payments for the FYs under appeal;

(c)     In the alternative, issuing a writ of mandamus ordering the Secretary to recalculate the FY 1984 standardized amount calculation and requiring that the Secretary adjust the standardized amounts for the Hospital PRRB Appeals and compensating Plaintiffs for the amount they were undercompensated in the relevant years;

(d)     Requiring the agency to pay legal fees and cost of suit incurred by the Plaintiffs; and

(e)     Providing such other relief as the Court may consider appropriate.

Date:   November 27, 2024                              Respectfully submitted,

                                                      */s/ Gregory N. Etzel*
                                                      Gregory N. Etzel (D.C. Bar No. TX0039)
                                                      Morgan, Lewis & Bockius LLP
                                                      1000 Louisiana Street, Suite 4000
                                                      Houston, TX 77002
                                                      Telephone: 713.890.5755
                                                      Facsimile: 713.890.5001
                                                      gregory.etzel@morganlewis.com

                                                      *Attorney for Plaintiffs*

## APPENDIX A

## LIST OF PLAINTIFFS

**CHRISTUS ST. FRANCES CABRINI HOSPITAL**
d/b/a Christus St. Frances Cabrini Hospital
3330 Masonic Drive
Alexandria, LA 71301

**CHRISTUS ST. PATRICK HOSPITAL**
d/b/a Christus St. Patrick Hospital
524 Dr. Michael DeBakey Drive
Lake Charles, LA 70601

**CHRISTUS HEALTH SHREVEPORT – BOSSIER**
d/b/a Christus Health Shreveport – Bossier
1453 E. Bert Kouns Industrial Loop
Shreveport, LA 71105

**CHRISTUS LAKE AREA HOSPITAL**
d/b/a Christus Lake Area Hospital
4200 Nelson Road
Lake Charles, LA 70605

**CHRISTUS ST. VINCENT REGIONAL MEDICAL CENTER**
d/b/a Christus St. Vincent Regional Medical Center
455 St. Michael's Drive
Santa Fe, NM 87505

**CHRISTUS GOOD SHEPHERD MEDICAL CENTER MARSHALL**
d/b/a Christus Good Shepherd Medical Center Marshall
811 S. Washington Avenue
Marshall, TX 75670

**CHRISTUS SOUTHEAST TEXAS – ST. ELIZABETH**
d/b/a Christus Southeast Texas – St. Elizabeth
2830 Calder Street
Beaumont, TX 77702

**CHRISTUS SPOHN HOSPITAL CORPUS CHRISTI**

d/b/a Christus Spohn Hospital Corpus Christi

600 Elizabeth Street

Corpus Christi, TX 78404

**CHRISTUS SPOHN HOSPITAL BEEVILLE**

d/b/a Christus Spohn Hospital Beeville

1500 E. Houston Street

Beeville, TX 78102

**CHRISTUS MOTHER FRANCES HOSPITAL**

d/b/a Christus Mother Frances Hospital

800 E. Dawson Street

Tyler, TX 75701

**CHRISTUS SPOHN HOSPITAL KLEBERG**

d/b/a Christus Spohn Hospital Kleberg

1311 General East Cavazos Blvd.

Kingsville, TX 78363

**CHRISTUS TEXAS MEDICAL CENTER**

d/b/a Christus Texas Medical Center

1301 Wonder World Drive

San Marcos, TX 78666

**CHRISTUS MOTHER FRANCES HOSPITAL SULPHUR SPRINGS**

d/b/a Christus Mother Frances Hospital Sulphur Springs

115 Airport Road

Sulphur Springs, TX 75482

**CHRISTUS SANTA ROSA MEDICAL CENTER**

d/b/a Christus Santa Rosa Medical Center

2827 Babcock Road

San Antonio, TX 78229

**CHRISTUS JASPER MEMORIAL HOSPITAL**

d/b/a Christus Jasper Memorial Hospital

1275 Marvin Hancock Drive

Jasper, TX 75951

**CHRISTUS ST. MICHAEL HEALTH SYSTEM**

d/b/a Christus St. Michael Health System

2600 St. Michael Drive

Texarkana, TX 75503

**CHRISTUS SPOHN HOSPITAL ALICE**

d/b/a Christus Spohn Hospital Alice

2500 E. Main Street

Alice, TX 78332

**RENOWN REGIONAL MEDICAL CENTER**
d/b/a Renown Regional Medical Center
1155 Mill Street
Reno, NV 89502

**RENOWN SOUTH MEADOWS**
d/b/a Renown South Meadows Medical Center
10101 Double R Blvd.
Reno, NV 89521

**PUBLIC HOSPITAL DISTRICT NO. 1 OF SNOHOMISH COUNTY**
d/b/a EvergreenHealth Monroe
14701 179th Avenue SE
Monroe, WA 98272

**KING COUNTY PUBLIC HOSPITAL DISTRICT NO. 2**
d/b/a EvergreenHealth Kirkland
12040 NE 128th Street,
Kirkland, WA 98034

**PRESBYTERIAN HOSPITAL**
d/b/a Presbyterian Hospital
1100 Central Avenue SE
Albuquerque, NM 87106

**PLAINS REGIONAL MEDICAL CENTER**
d/b/a Plains Regional Medical Center
2100 N. Martin Luther King, Jr. Blvd.
Clovis, NM 88101

**PRESBYTERIAN SANTA FE MEDICAL CENTER**
d/b/a Santa Fe Medical Center
4801 Beckner Road
Santa Fe, NM 87507

**ST. HELENA HOSPITAL**
d/b/a Adventist Health St. Helena
10 Woodland Road
St. Helena CA 94574

**WHITE MEMORIAL MEDICAL CENTER**
d/b/a Adventist Health White Memorial
1720 E Cesar E Chavez Avenue
Los Angeles, CA 90033

**HANFORD COMMUNITY HOSPITAL**
d/b/a Adventist Health Hanford
115 Mall Drive
Hanford, CA 93230

**REEDLEY COMMUNITY HOSPITAL**
d/b/a Adventist Health Reedley
372 W Cypress Avenue
Reedley, CA 93654

**SIMI VALLEY HOSPITAL AND HEALTH CARE SERVICES**
d/b/a Adventist Health Simi Valley
2975 Sycamore Drive
Simi Valley, CA 93065

**GLENDALE ADVENTIST MEDICAL CENTER**
d/b/a Adventist Health Glendale
1509 Wilson Terrace
Glendale, CA 91206

**UKIAH ADVENTIST HOSPITAL**
d/b/a Adventist Health Ukiah Valley
275 Hospital Drive
Ukiah, CA 95482

**SONORA COMMUNITY HOSPITAL**
d/b/a Adventist Health Sonora
1000 Greenley Road
Sonora, CA 95370

**LODI MEMORIAL HOSPITAL ASSOCIATION, INC.**
d/b/a Adventist Health Lodi Memorial
975 S. Fairmont Avenue
Lodi, CA 95240

**SAN JOAQUIN COMMUNITY HOSPITAL**
d/b/a Adventist Health Bakersfield
2615 Chester Avenue
Bakersfield, CA 93301

**ADVENTIST HEALTH DELANO**
d/b/a Adventist Health Delano
1401 Garces Hwy
Delano, CA 93215

**ADVENTIST HEALTH TULARE**

d/b/a Adventist Health Tulare
869 North Cherry Street
Tulare, CA 93274

**CASTLE MEDICAL CENTER**

d/b/a Adventist Health Castle
640 Ulukahiki Street
Kailua, HI 96734

**MID-COLUMBIA MEDICAL CENTER**

d/b/a Adventist Health Columbia Gorge
1700 E 19th Street
The Dalles, OR 97058

**PORTLAND ADVENTIST MEDICAL CENTER**

d/b/a Adventist Health Portland
10123 SE Market Street
Portland, OR 97216